*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CF-0340

JAMES A. DOBY, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2023-CF2-006391)

(Sean C. Staples, *Judge*)
(Robert A. Salerno, *Judge*)

(Argued November 20, 2025             Decided July 16, 2026)

*Thomas G. Burgess* was on the briefs for appellant.

*Matthew L. Brock*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *Elizabeth H. Danello*, and *Lindsey Miller*, Assistant United States Attorneys, were on the brief, for appellee.

Before DEAHL, HOWARD, and SHANKER, *Associate Judges*.

DEAHL, *Associate Judge*: James Doby was walking down the street one night when three police officers, who had received reports of a shooting in the immediate area, pulled their marked cruiser up alongside him. The officers noticed an L-shaped

bulge in Doby's right jacket pocket, and one officer asked him whether he had a gun as the other officers exited the car. Doby did not answer and continued on his way. Within seconds, as the two officers walked toward him, Doby took off running. As the officers chased Doby, they noticed him "fiddling with the [jacket] pocket" and suspected he was trying to pull out a gun. After about forty-five seconds, Doby stopped running and surrendered. The officers patted him down and found a handgun in his right jacket pocket.

Doby moved to suppress the firearm as having been recovered in violation of his Fourth Amendment rights, and the trial court denied that motion. After a stipulated trial, Doby was convicted of unlawful possession of a firearm and several related offenses. Doby now appeals, challenging the trial court's denial of his suppression motion. He argues that the officers lacked the requisite reasonable articulable suspicion to seize him and pat him down. We disagree and affirm his convictions.

## I. Facts and Procedural Background

Officers Marcus Harmon, Matthew Zumbrun, and Evan Zelesnick received a radio call indicating that there had been a shooting near the 100 block of Ivanhoe Street Southwest. More specifically, a gunshot victim had arrived at a hospital and reported that he had been shot at that location, though he offered no description of

the shooter. The three officers drove to that area and arrived about twenty to thirty minutes after they heard the radio call. Officer Zumbrun was driving the vehicle.

What happened next was largely captured on body worn camera and that footage was admitted at the suppression hearing. As the officers approached Ivanhoe Street, Harmon saw Doby walking on the sidewalk to their left, and he appeared to have a heavy object in his right jacket pocket that was weighing the jacket down so that it sagged on the right side. Harmon said "left" to alert the others to Doby's presence. Zumbrun then activated his car's scene lights, which are distinct from sirens and are used to brighten the surrounding area. At that point Doby started "darting around," taking "sidesteps a bit away" from the officers, and he turned his right side away from the officers while "grabbing the bottom [right side] of the jacket and holding it close to his body."

Zumbrun observed an "L-shaped object" in Doby's right jacket pocket and remarked that "there's something in his right jacket pocket," as another officer commented, "man he's freaking out." Zumbrun then stopped the car near Doby and asked through the window, "Sir, you got a gun in your jacket?", as Harmon and Zelesnick exited the vehicle. Doby kept walking without answering in any decipherable way. As Harmon and Zelesnick started walking toward him, Doby quickly took off running. Harmon and Zelesnick chased Doby, who was holding the

right side of his jacket and "fiddling" with it as he ran, leading Harmon to think he was trying to pull out what he suspected was a gun. Harmon yelled, "Hey, drop the gun! I'll fucking shoot! Drop it!", but Doby kept running. After about forty-five seconds, Doby stopped running and put his hands up.

Harmon patted Doby's right jacket pocket, which was zipped up, "immediately felt what [he] knew to be a firearm," and then handcuffed Doby. Harmon then unzipped the pocket, retrieved a handgun, and arrested Doby. Before his trial on several firearm-related offenses, Doby moved to suppress the gun. He argued that (1) officers seized him upon their approach, before he ran, and that they lacked reasonable articulable suspicion for that seizure, and (2) even if he was seized only after he ran, his flight did not meaningfully change the reasonable suspicion calculus, so that officers were not justified in stopping him at that point either.

Officer Harmon was the only witness who testified at the suppression hearing. In addition to authenticating the body worn camera footage and narrating the events above, he also testified about the prevalence of firearm-related crimes in his patrol area, which encompasses the Bellevue and Blue Plains neighborhoods near the District's southernmost tip and includes the area where he stopped Doby. Harmon testified that he was aware of nine violent offenses committed with firearms in the previous month in his patrol area. More specifically, he said that there had been one

homicide, three assaults with deadly weapons, and five armed robberies, all committed in his patrol area in the prior month.

The court denied the motion to suppress. It determined that Doby was not seized when the police first approached him on the street, such that the key question was whether officers had reasonable articulable suspicion to seize him and pat down his jacket pocket when he stopped running. The court ruled that the officers did have reasonable articulable suspicion based on "the way [] Doby acted during the initial phase of the interaction" with police, his flight, and "the fact that during his flight, he continued to reach" into his jacket "to attempt to discard whatever was in that pocket." The parties agreed to a stipulated trial, and the trial court found Doby guilty on all counts.

Doby now appeals his convictions, challenging the court's denial of his suppression motion.

## II. Analysis

On appeal, Doby does not renew his argument from the suppression hearing that he was seized when officers initially approached him; instead, he acknowledges that he was not seized until after he fled from officers and ultimately surrendered to them. Accordingly, he and the government agree that the dispositive question before

us is whether officers had reasonable articulable suspicion to stop him and pat him down when he surrendered. If they did, the trial court was correct to deny his suppression motion; if they did not, his suppression motion should have been granted.

Under the Fourth Amendment, police must have reasonable articulable suspicion that a person is engaged in criminal activity to conduct a brief investigatory stop, often referred to as a *Terry* stop. *Mayo v. United States*, 315 A.3d 606, 620 (D.C. 2024) (en banc); *Terry v. Ohio*, 392 U.S. 1, 21 (1968). During a *Terry* stop, an officer may "conduct a protective frisk for weapons, similarly known as a *Terry* frisk, if he has a reasonable, articulable suspicion that the person detained is armed and dangerous." *Brown v. United* States, 313 A.3d 555, 561 (D.C. 2024) (quoting *Funderburk v. United States*, 260 A.3d 652, 656 (D.C. 2021)). Generally, if officers did not have reasonable articulable suspicion to stop, or to later frisk, the defendant, then anything they confiscated must be suppressed as "fruit of the poisonous tree." *Dozier v. United States*, 220 A.3d 933, 940 (D.C. 2019). Whether the facts give rise to reasonable articulable suspicion raises a legal question that we review de novo. *Mayo*, 315 A.3d at 616-17. Reasonable articulable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id.* at 620 (quoting *Kansas v. Glover*, 589 U.S. 376, 380 (2020)). To determine whether there was reasonable articulable

suspicion of a crime, courts evaluate whether the totality of "the facts available to the officer at the moment of the seizure . . . 'warrant a person of reasonable caution in the belief' that the stop was appropriate." *Id*. (quoting *Terry*, 392 U.S. at 21-22).

In arguing that officers did not have reasonable suspicion to stop him, Doby first highlights that officers did not have reason to suspect that he had shot the hospitalized victim, as they had no description of that shooter nor did they know precisely when that shooting occurred. The government concedes the point, and we agree that the officers did not have reasonable suspicion to think that Doby had shot that individual. But that does not mean we should entirely discount the report of that shooting from the overall reasonable suspicion calculus. *See generally District of Columbia v. R.W.*, 608 U.S. ----, 146 S. Ct. 1069, 1070 (2026) (explaining that we must "look at the 'totality of the circumstances' of each case," which "precludes the 'evaluation and rejection' of 'factors in isolation from each other'" (quoting *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002))); *D.W. v. United States*, 2026 WL 1911893, at *6 n.2 (D.C. 2026) (en banc) (stressing "that pertinent factors must be viewed collectively when conducting Fourth Amendment analyses"). That shooting surely, and justifiably, would have made the officers hyper-aware of the potential for an armed shooter in the area, and it reasonably would have colored their views about their interactions with Doby. That is, the fact that he appeared to have a firearm, and seemed panicked upon the officers' approach, must be viewed under

the lens of a very recent report of a shooting in the area. *See Mayo*, 315 A.3d at 621 (explaining that "[m]ultiple factors may contribute to the totality of the circumstances" including "a report of criminal activity or gunshots" (quoting *Posey v. United States*, 201 A.3d 1198, 1201-02 (D.C. 2019))).

Bearing that in mind, the following factors plus the report of the shooting provided reasonable suspicion that Doby was engaged in criminal activity: (1) the officers observed an L-shaped bulge in Doby's jacket pocket; (2) Doby seemed panicked and evasive upon the officers' initial approach; (3) he ran shortly after officers asked him a single question, without answering the question about whether he had a gun; and (4) he was fiddling with his pocket as he ran.[1] We now elaborate on each of those points.

---

[1] Harmon also testified to "relevant, nonconclusory details about crime in the location" where Doby was stopped, *Mayo*, 315 A.3d at 632, and that could properly factor into our reasonable suspicion assessment as well. Still, Harmon's testimony about nine violent offenses committed with firearms in the previous month pertained to a fairly large "Patrol Service Area," to wit, PSA 708; it is difficult for us to assess, on this record, if nine violent offenses committed with firearms in a month makes PSA 708 a particularly "high-crime area"—as the trial court posited—as Harmon did not use any similar descriptors and did not elucidate whether that number of offenses in a month rendered PSA 708 more crime-ridden or violent than your typical PSA. Because we conclude that officers had reasonable suspicion for a stop and frisk independent of this factor, we do not opine on how much additional weight this evidence contributes to the reasonable suspicion calculus.

First, the officers observed an L-shaped bulge weighing down Doby's pocket, which to them indicated that Doby likely had a firearm. Doby argues that the mere possession of a firearm does not amount to reasonable articulable suspicion of wrongdoing, as the Supreme Court made clear in *Bruen* that adult citizens have a constitutional right under the Second Amendment to carry firearms outside the home. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 10 (2022) (holding that the Second Amendment "protect[s] an individual's right to carry a handgun for self-defense outside the home"). That is true enough, but again, we cannot view this fact in isolation when assessing its weight in the reasonable suspicion calculus. *See D.W.*, 2026 WL 1911893, at *6 & n.2; *Mayo*, 315 A.3d at 637 (assessing the "totality" of circumstances "collectively"). And in these circumstances, including the recent report of a shooting, Doby's nervousness, and his flight from officers, his apparent possession of a firearm weighs heavily in favor of reasonable suspicion. *See Newman v. United States*, 258 A.3d 162, 165-66 (D.C. 2021) (per curiam) (holding that defendant's conduct after being seen by police, including fleeing and "clutching his waistband," made it reasonable for police to suspect he possessed illegal contraband). To draw an analogy, people are free to walk down the street with their children at night. But if officers received a report of a recent kidnapping in a particular area, and upon reaching that area saw a child walking with a man who appeared to panic upon their approach and fled when officers inquired about his

relationship with the child, the presence of the child with him would weigh heavily in favor of reasonable suspicion to stop that man to further investigate.

Second, Doby looked nervous and evasive on the officers' initial approach. He was "darting around," taking sidesteps away from the officers, and holding the bottom of his jacket close to his body. As Doby points out, nervousness in the face of approaching officers is a typical enough human reaction and not so incriminating by itself, *see Golden v. United States*, 248 A.3d 925, 946 (D.C. 2021), particularly when the suspect is a black male who is alone at night, *see Dozier*, 220 A.3d at 944 (factoring a suspect's race into the reasonable articulable suspicion analysis). But Doby's behavior here went beyond mere nervousness. He turned the right side of his body away from the police, shielding the area where officers had seen already the heavy bulge, and held his jacket pocket in a protective manner. *See Golden*, 248 A.3d at 946 (explaining that nervousness has more "corroborative value" when "linked to some objective evidence" that a defendant "was carrying a firearm"); *Singleton v. United States*, 998 A.2d 295, 300-01 (D.C. 2010) (finding reasonable articulable suspicion based on the size and shape of the bulge in the defendant's pocket, his "stiff gait" while walking away from officers, and his "protective hand gesture" over the pocket).

Third, after officers observed a bulge in Doby's pocket and asked if he had a gun, Doby led them on a protracted chase. "Headlong flight . . . is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *see also D.W.*, 2026 WL 1911893, at *4 (similar); *Mayo*, 315 A.3d at 626 ("[F]light . . . does not automatically justify a *Terry* stop, and the degree to which flight reasonably gives rise to an inference of consciousness of guilt and thereby contributes to reasonable articulable suspicion depends on context."). Doby suggests that this court's recent decision in *Mayo* supports the contrary conclusion, and that we should attach minimal weight to his flight given the aggressiveness of the officers' approach. But this case does not resemble *Mayo* for a number of reasons: (1) the officers in *Mayo* did not see a bulge consistent with a firearm, *Mayo*, 315 A.3d at 615, whereas the officers here observed what appeared to be a firearm on Doby; (2) the officers in *Mayo* were not responding to any report of a recent crime, *id.* at 622, much less a shooting that rightly put the officers here on heightened alert for firearms; (3) there was no evidence that Mayo was "freaking out" upon the mere sight of officers, as Doby appeared to be; and (4) the Gun Recovery Unit that arrived on the scene in *Mayo* had a well-known reputation for aggressive police tactics, which somewhat mitigated the incriminating value of Mayo's flight, *id.* at 631, whereas there was no evidence that the officers here were similarly aggressive or were part of some

identifiable broader unit with a reputation for that behavior. In short, there were a number of factors in *Mayo* that mitigated the incriminating value of Mayo's flight that are absent here and, conversely, there are a number of factors here that heighten the incriminating weight of Doby's flight as compared to Mayo's.

Fourth, Officer Harmon observed Doby fiddling with his pocket while he fled in a manner that suggested he was trying to remove an object from his pocket. The court credited these observations, and Doby does not contend that the court clearly erred in doing so. This factor weighs heavily in our analysis—it further indicated to officers that Doby had a firearm in his pocket that he was either trying to discard or use unlawfully. *See Pridgen v. United States*, 134 A.3d 297, 303 (D.C. 2016) (emphasizing in its reasonable articulable suspicion analysis that the defendant ran "while holding his hand against his left jacket pocket" and moved his hand around the pocket even after officers shouted to stop).

Taken together, the totality of the circumstances here provided officers with reasonable articulable suspicion that Doby was engaged in criminal wrongdoing sufficient to justify his seizure, to wit, that he was unlawfully in possession of a firearm. Doby does not independently challenge that the officers had the requisite suspicion to justify a pat down search if their seizure of him was lawful, so we treat that point as conceded and uphold the trial court's denial of the suppression motion.

## III. Conclusion

For the foregoing reasons, we affirm Doby's convictions.

*So ordered*.